<div style="margin-left:margin">DEPAS<br>v.<br>RIEZ.</div>

all the property composing the succession of *Phinias Depas*, or of its proceeds, as the case may be, as a usufruct only.

7. The plaintiff to receive, in full property, the other four-fifths of his father's succession, and the evidence of the securities which the defendant is bound to give.

It is further ordered, that the costs of this appeal be paid by the plaintiff and appellant, in equal portions.

There is no error in the judgment of the court below, dismissing the executrix from office. The 3d sect. of the act of 1837 is imperative, and it is not pretended that she has complied with its requisitions. The allegation that she was dispensed from complying with them by the plaintiff's counsel, is not sustained by evidence. That judgment is, therefore, affirmed, with costs.

---

### MACARTY et al. *v.* NEW ORLEANS THEATRE COMPANY.

Where, on an appeal from a judgment perpetuating an injunction staying the execution of a judgment, the record does not state the amount of the judgment enjoined, nor the rate of interest which it bore, no additional interest can be allowed on reversing the judgment below and dissolving the injunction.

APPEAL from the Parish Court of New Orleans, *Maurian*, J. This case turned upon questions of fact. In delivering their judgment, the court, through SLIDELL, J., say: On the subject of damages for the injunction which the defendants have asked, it is to be observed that the record does not inform us what was the precise amount of the judgment enjoined, nor the rate of interest which it bore, which are indispensable, to enable us to give additional interest. See the case of *Smith* v. *Brownson*, 19 La. 313.

*Bodin* and *Pilié*, for the plaintiffs. *St. Paul*, for the appellants.

---

### BEAULIEU et al *v.* FURST.

A judge can recuse himself, only where the parties would have the right of recusing him. C. P. 340.

A judge cannot recuse himself on the ground, of one of his relations having an interest in the event of the suit. C. P. 338.

Where an appeal is tried before three judges, the concurrence of two is sufficient to reverse the judgment of the inferior court. Const. art. 68.

APPEAL from the District Court of the First District, *Buchanan*, J. A verdict and judgment having been rendered in this case in favor of the defendant, for $6,559 87, with interest at five per cent a year, from the 13th October, 1838, till paid, the plaintiffs appealed; and the case having been argued by *I. W. Smith* and *Soulé*, for the appellants, and *G. B. Duncan*, *Benjamin* and *Micou*, for the defendant, SLIDELL, J. recused himself, in consequence of the interest of a relation in the event of the suit, when the following opinion of the majority of the court was pronounced by

Rost, J.   In a small tenement situated on the Metairie road, in the adjoin-ing parish of Jefferson, have dwelt for such a length of time as the memory of man scarcely runs to the contrary, a black woman, at the time the transactions involved in this controversy bear date, over eighty years of age, her two sons and her daughter, all, at this period, much advanced in life.   Not one of them can either read or write, and they are remarkable, even among their race, for want of intelligence, and ignorance of the world and its ways.   They cultivate, for marketing, a small field of vegetables, out of the proceeds of which they contrive to live.   When they lose an ox, they find great difficulty in raising the means necessary to replace it.

On the 28th April, 1837, *Le Carpentier*, a young man about twenty years of age, and lately arrived from France, came to their house in company with one *Emerling*, a property broker, and asked them to affix their ordinary marks to some notes made payable *in solido*, and also to a deed, purporting to be a notarial act before *Theodore Seghers*, a notary public in and for the city of New Orleans.   They did as they were asked.   *Le Carpentier* brought back the act and notes to the office of *Seghers*, designated to one of the clerks the marks of each of the plaintiffs, and their names were written around them by that clerk, in presence of *Le Carpentier*.   Both signed as witnesses; and the notary, in wanton disregard of his duty and of his oath, authenticated the act as passed before him.

That act is, on the face of it, a conveyance of real estate by the defendant to the plaintiffs, in consideration of the sum of $13,400, for which it states notes *in solido*, made payable by the plaintiffs to the order of *F. Hazeur*, to have been given, and to have been secured by mortgage on the property sold, and also on the homestead of the plaintiffs.

The first note was protested at maturity for non-payment, and the defendant caused the property sold by him to the plaintiffs to be seized under the mort-gage.   It was adjudicated to a third person for $7,000.

The second note was also protested at maturity for non-payment, and the defendant obtained against the property of the plaintiffs another order of seizure, which was subsequently converted into an ordinary suit.

The plaintiffs, alleging error, fraud and deception, on the part of the defendant and his agent, and also that the act, under which he claimed, was null and void, because their marks had not been affixed thereto in presence of the notary, or in his office, applied for, and obtained an injunction.   They called on the defend-ant to answer on oath various interrogatories, which he answered; he further denied all their allegations, and averred the transaction to have been, on his part, fair and unsullied by deception or fraud.

Six juries have been sworn to try that issue.   The first four were unable to agree on a verdict; the fifth found a verdict for the defendant.   Judgment went in his favor, and, on appeal, it was reversed, and the case remanded on bills of exception.   On the last trial, the jury again gave a verdict in favor of the defendant, and the plaintiffs have appealed from the judgment rendered thereon.

We agree fully with the counsel of the defendant that, as a general rule, after two verdicts on an issue of fraud, the court ought not to interfere, unless those verdicts are manifestly contrary to law and evidence; but we must pre-mise that this is a case, in which the arbitration of the jury has not as much weight with us as it would have if the parties to the suit were of equal condition.

BEAULIEU
*v.*
FURST.

The excellence and safety of jury trials consist in the fact, that the jurors are, or ought to be, the peers and equals of the parties. Juries *de medietate linguæ*, and the frequent resort to special juries originate, to a great extent, in the policy of preserving that equality. In this controversy, the case of the plaintiffs was not tried by their peers and equals, and the fact that, the first verdict gave the defendant a much larger sum than he claimed, and compelled him to enter a *remittitur*, affords strong evidence that this jury, at least, did not weigh the rights of the plaintiffs with the care required to give authority to their decision. It is our duty to shield the legal rights of the plaintiffs from the prejudices of cast; and we deem their dependent condition sufficient to put us upon inquiry, whether impartial justice has been done to them?

The defendant admits that the act under which he claims is not authentic. The plaintiffs, on the other hand, have acknowledged that they affixed their marks to it and to the notes. Does that acknowledgment, taken in connexion with the facts disclosed by the defendant's evidence, prove any thing more than *rem ipsam?* Does it prove the act—does it establish the fact that the plaintiffs purchased the house and lot from him, and gave him, in payment, their notes, *in solido*, for $13,400, secured by mortgage on the property sold, and on their homestead?

Whoever claims the price under a contract of sale must show affirmatively the consent of the purchaser to the contract. If the acknowledgement of the plaintiffs, that they affixed their marks to the act and notes, proves their consent, the defendant should have stopped there, and rested that part of his case upon the written evidence. Had he done so, the naked question of the legal effect of the acknowledgement would have been fairly placed before us. He has seen fit to adopt a different course; he has gone beyond the act, and, by introducing parol evidence, to prove *en pais* the fact of consent, he has, as it were, dissolved the contract into its original elements. Although a party may object to the introduction of parol evidence to prove the transfer of real estate, if it is admitted without opposition, it is binding upon him; *a fortiori*, is it binding upon the party who himself introduces it.

*Emerling* and *Le Carpentier* were the only persons present when the plaintiffs made their marks. *Le Carpentier* read the documents to them, and *Emerling* swears that there was no explanation given them, *but by him*. His testimony is as follows: He explained the act to them, and they appeared to understand it very well. It does not appear that he mentioned the object of the notes to them. Cross-examined, he says, he asked them if they understood, and knew what they were about. They all answered distinctly that *they did*. He is a German, has been in Louisiana seven or eight years, speaks French well enough to make himself understood, and spoke to the plaintiffs in that language.

The first objection to this evidence is, that the plaintiffs speak no language save the creole *patois*, which is not, that we are aware, taught in German universities.

Several witnesses gave it as their opinion that *Emerling* could not have made himself intelligible to them, and that it is impossible he could have made them understand what a mortgage was; and, by-the-by, he is the only witness who testifies that they consented to the mortgage under which the defendant now claims. The testimony of *A. S. Lewis*, the officer of the court who went to their house to get them to sign the affidavit and the injunction bond in this case, satisfies us that no faith is to be given to that of *Emerling*. This witness en-

deavored three, or four, different times to explain to them the purport of the oath and of the bond, and doubts whether they understood him then. He spoke the creole *patois* to them, and could not get them to understand French. They appeared to him as ignorant as they could well be, and there was no pretention of ignorance about them. Two other persons, there present, had to assist him in his explanations.

*Emerling* had the property for sale for the defendant as his broker, and received two per cent commission, for the sale of it to the plaintiffs. He has shown himself not over scrupulous, and we have no reason to doubt that he has placed the defendant's rights in the most favorable light, consistent with such a regard for truth as may fit the standard of his morality; but it appears to us that his knowledge of the language of the plaintiffs and of the laws of Louisiana, was inadequate to the task he undertook to perform; and the facts disclosed by his evidence induce the belief that, if it had not been, he would not have cared to teach the plaintiffs what a mortgage was, and in how short a time it could divest them of their home, but would have been content to make up a plausible story and secure his commission.

While acting as broker for the defendant, he made with the plaintiffs a secret bargain, by which he was to receive two per cent commission from them to betray his employer. After the purchase he took possession of the property, worth a rent of $40 per month, without any authorization from the plaintiffs, and kept it one year to pay himself a commission of two per cent on $13,200. Subsequently he called upon the plaintiffs, and, instead of accounting to them, insisted upon being paid his commission a second time. No other witness, save *Le Carpentier*, knows any thing about the sale and mortgage. The fact that the plaintiffs were decoyed by a brace of swindlers to go and visit the house, cannot surely be taken as proof of the subsequent purchase; and the other fact, that they appeared to those who occupied the house not more stupid than negroes generally are, cannot stand in opposition to the testimony of the officer of the court, who, in discharge of his duty, had to test their intelligence.

Had the notary himself been present, and had he testified in the cause as *Emerling* has done, the trust reposed in him by law in matters of that kind, would have rendered his evidence sufficient.

It may be that the only object of the defendant in introducing the evidence of *Emerling*, was to disprove fraud; but if it discloses a state of facts inconsistent with the hypothesis of consent on the part of the plaintiffs, one of the essential requisites of the contract is wanting, and the mechanical operation of holding the pen while the marks were being made, cannot supply it. It is said that parties affixing their ordinary marks to an act are bound to know, and must be presumed to have known, the contents of it; but we are of opinion that this presumption is not *juris et de jure*, and that it does not exist where the party claiming adversely to them under the act, shows that they had not the means of knowledge.

We believe that the jury did not take this view of the case, and that, being satisfied that the defendant himself had not committed the fraud alleged against him, they considered themselves bound to decide in his favor. They probably overlooked the fact that, through the acts or omissions of his agent, the sale might be void for want of consent, although no moral guilt could attach to him.

The inference that the price bargained for was not exorbitant at the time, drawn from the fact that some months previous to the sale, a bid of over $12,000

was offered at public auction for the property, was well calculated to mislead the jury. The sudden change which took place in the value and availability of real estate in the months of March and April of that year, is an historical fact which does not appear to have been noticed. The ignorance and seclusion of the plaintiffs prevented their being apprized of the change, and they were probably the only persons living, having any thing to lose, who could have been induced to make the purchase at that time. The fact that they did make it, must, therefore, be placed beyond the reach of doubt. With men as well informed as the defendant, the operation would have been all fair; but we are not prepared to say that it was so, with a superannuated negro woman, brought into the vortex of speculation at that late hour by the arts of such men as *Hazeur* and *Emerling*.

The defendant is not shown to have had any participation in bringing about the sale, but the acts of *Emerling* accrued to his benefit.

If the mother were the only party to the contract, the court would have no hesitation in remanding the cause. The fact that her sons and her daughter are bound *in solido* with her, and would be deprived by the judgment of the means of supporting her, does not the less entitle her to relief.

After a long, patient and thorough investigation of this cause, a majority of the court have come to the conclusion that justice requires that it should be remanded, and submitted to another jury.

It is therefore ordered, that the judgment be reversed, and the case remanded to be proceeded in according to law; the defendant and appellee paying the costs of this appeal.

EUSTIS, C. J., dissenting. A very thorough consideration of this case has not enabled me to concur with my brethren in the disposition they have made of it. Our difference of opinion relates, I believe, only to matters of fact. I am not aware of any naked question of law, which is presented for our determination, concerning which we do not concur. The case turns exclusively on the facts, according to my view of it. Were there any such questions of law, which the court could examine, independent and separate from the facts, and it should be in favor of the plaintiffs, they certainly should have the benefit of it, for I never could consent to surrender the decision of questions of law to a jury.

The point which, it appears, presents the principle obstacle to the affirmance of the judgment, is the want of consent of the *Beaulieus* to the contract of sale, which is sought to be enforced by *Furst;* and this defect of consent seems to rest on the want of credibility of a witness, and on their gross ignorance and want of intelligence.

On this subject, I consider that the defendant, *Furst*, has the verdict of two juries, under evidence which was contradictory, and which it was peculiarly their province to weigh and determine.

In a case of this kind, involving the reputation of a party, the credibility of a witness, and questions of fact resting on contradictory evidence, I do not feel myself at liberty, in the exercise of a sound legal discretion, to set aside this second verdict, which the defendant has had in his favor. A much stronger case than this ought to be made out, before the court would be authorized, in my judgment, to set aside the verdict. I, therefore, dissent from the opinion of the court.

The day after these opinions were read, the counsel for the defendant, on motion, obtained an order of court for the appellants to show cause why the decree reversing the judgment of the lower court should not be set aside, and one affirming the judgment be rendered in its place, on the ground that the constitution of the State orders the judgment of the court below to be affirmed in all cases tried before the four judges of the Supreme Court, unless three of the judges unite in reversing it.

*G. B. Duncan, Benjamin* and *Micou,* argued that the judgment of the court below must be affirmed.

*Soulé,* contrâ. The rule taken by the appellee, and the argument at the bar, imply: 1st. That under the present organization of the court, unless three judges should assent to a decree of reversal, the judgment appealed from is to be affirmed. 2nd. That it is not lawful for any judge to recuse himself after hearing a case, and that his abstaining from all participation in the judgment rendered, amounts to an agreement with the minority of the court, and is to be construed accordingly. 3rd. That the parties litigant have a right to inquire into the motives which may have induced the judge to recuse himself.

From such premises only can be inferred the broad principle assumed by the appellee in the rule, that, as the four judges were present at the hearing of the case, they must be considered as having participated in the decree rendered; and that, therefore, as but two judges were for the reversal of the judgment appealed from, the same ought to be affirmed. The appellee has quoted, in support of his pretensions, article 68 of title 4 of the constitution, and articles 338 and 340 of the Louisiana Code of Practice. The appellants submit, in answer, the following brief remarks:

I. By the article quoted from the constitution, no decree of an inferior court can be affirmed on the appeal, unless it actually meets with the assenting opinion of at least two judges. Two, when they are equally divided; two, when there is but a quorum of the court. A majority of the four judges constitute a quorum (title 4, art. 64, Const.), and when they are a quorum, they possess the full constitutional authority vested in the court; and this must be based on the presumption that the judge absent or recused would, if present or not recused, have joined the majority; otherwise, the recognition of sufficient power in three of them to act for the whole court would constitute a glaring inconsistency, and defeat the very principle which provides that an equal division of the judges shall enure to the benefit of the party having the judgment of the court of original jurisdiction.

II. That judges may recuse themselves, is not denied, and, indeed, one of the articles quoted from the Code of Practice provides, "that the judge may recuse himself in such cases, where the parties themselves would have the right of recusing him." But it seems to be the opinion of the counsel for the appellee, that this recusation cannot take effect after the hearing of the case, nor without the parties having the opportunity of testing the correctness of the ground upon which it may be founded. Judges, in England, have considered not only that they were at liberty to abstain from giving an opinion after hearing the case, but that they might even participate in the form of the judgment, without at all joining in the opinion of the other judges. In the case of *Tatham* v. *Wright,* which had been heard before the Lord Chancellor, assisted by the Lord Chief Justice and the Lord Chief Baron, the Lord Chancellor said: "That he had given no opinion, and should give none; that the judgment was in form his, in substance that of the other learned judges; his former position as counsel in the case, precluded him from giving any opinion as to its merits." *Legal Observer,* London, vol. 2, pages 317, 318. But the rule of law which prevails here, being derived from the French Code of Practice, it may not be improper to test its bearing with the French authorities, and to ascertain how in the French tribunals it was formerly understood, and is still now applied. The royal ordinance of 1667, after stating the cases in which judges may be recused by the parties, has this provision: "The judge who is aware of the existence in himself of sufficient cause of recusation, shall recuse himself, without awaiting that he be recused by others." Art. 17. And the article 380 of the French Code of Practice also provides, "that any judge who may be aware of the existence in himself of some cause of recusation, is bound to declare it,

in order that it may be decided whether or not he shall abstain." Under the rule laid down in 1667, it had been contended by some that the recusation, when coming from the judge himself, was to be acted upon by decree and confirmed. Indeed there was an express provision to that effect in article 24 of the ordinance; but, says Favart de Langlade, vol. 4, page 765: "L'ordonnance ne s'observait pas à la rigeur dans le ressort de plusieurs parlements, et nombre de juges se déportent aujourd'hui sans qu'une décision de la Chambre ordonne qu'ils s'abstiendront." As to the time when the judge was to abstain, or to recuse himself, the same author adds: "La loi ne fixe pas le temps dans lequel le juge qui reconnaît cause de recusation en sa personne est tenu d'en faire la declaration." Ibid. Nor is any time fixed by the article quoted from our own Code of Practice.

The very point in controversy was brought, in 1832, before the Court of Cassation, under the authority of article 380 of the French Code de Procedure, which is so much more restrictive than our own, and the court held: "that in the case of a judge recusing himself, the question was one of discipline, cognizable only by his colleagues, involving no contradictory proceedings, no debate, arising from the spontaneous declaration of the judge that there exist legitimate reasons why he should abstain, and requiring neither decree nor procès-verbal, but a mere mention of the motives that induce him to abstain." See the opinion at length in the Journal du Palais of Ledru Rollin, vol. 24, years 1831, 1832, page 1126.

The appellants maintain: 1st. That a judge may abstain in all cases for reasons which might justify parties in recusing him, and this at all times before judgment. 2nd. That such a recusation is only cognzable by the court in chambers, and need not be preceded by decree, debate, nor procès-verbal. 3rd. That the exercise of judicial authority manifests itself only in the opinions and decrees delivered by the judges, and not in the part which they may have taken in the hearing of the case. 4th. That there is nothing so sacramental in the hearing of a case as should preclude a judge who has participated in it from recusing himself afterwards, if he should discover that there is sufficient reason for doing so. 5th. That the constitution, when determining the number of judges necessary to form a decree, does not compute the judges present at the hearing of a case, but those giving an opinion in the case. Art. 68, tit. 4. 6th. That in the present case but three judges participated in the decision. They formed a quorum. They could not force the fourth to join them in their deliberations. They were bound to dispose of the case. They did dispose of the case. Their decree ought to be maintained, and the rule dismissed.

*I. W. Smith,* on the same side.

An application for a re-hearing was also presented in this case by the counsel for the defendant.

The opinion of the court on the rule and on the application for a re-hearing, was pronounced by

SLIDELL, J. When the decision of this case was under deliberation, a member of this court, believing that one of his relatives, not however a party to the cause, was indirectly interested in the event of the suit, declined to participate in the decision.

A consideration of the constitution and of articles 338 and 340 of the Code of Practice, and a conference with his brethren, have satisfied the mind of that judge that, he had not the strict legal right to decline giving an opinion in this case. The defendant's counsel having invoked the strict legal rule, we have therefore concluded that, under the circumstances, the whole bench should participate in the decision of this cause.

But while we thus yield obedience to the rigid provisions of the Code, we must, at the same time, take occasion to observe that, when circumstances not strictly within the textual provisions of the Code of Practice, render it disagreeable to a judge to take part in the decision of a case, and there it a quorum of the court without him, we do not believe the general interests of justice would be, in all cases, promoted by the subjection of a right of conscience to a mere

<div style="text-align: right;">BEAULIEU<br>v.<br>FURST.</div>

arbitrary rule. It seems to us that a judge's scruples, and the propriety of his joining in the decision of a case, should be left, without discussion at bar, to the consideration of himself and his brethren. Such a course it is desirable that the bench should be left to pursue, and such also appears to us to be the interest and duty of the bar, who are not the mere representatives of their clients, but are also, as was well said by a learned judge, "ministers of justice acting in aid of the courts."

It being the opinion of the court that the defendant, *Furst*, was, under the circumstances, legally entitled to a decision of this cause by a full bench; and it being also the opinion of the court that he is not, under the constitution, entitled to the specific relief prayed for by his motion, it is therefore ordered that a re-hearing be granted; and it is further ordered that the rule taken by *Furst* be dismissed.

## SAME CASE—ON A RE-HEARING.

Judgment below affirmed, the judges being equally divided.

ON the re-hearing of this case, the judges being equally divided in opinion, separate opinions were given.

EUSTIS, C. J., for the reasons assigned in the dissenting opinion pronounced by him on the first hearing, was of opinion that the judgment below should be affirmed.

ROST, J. persisted in the opinion just pronounced by him, adding :

The appellate jurisdiction of this court extends to facts as well as law; it is our duty, therefore, to preserve the purity of the sources from which the knowledge of facts is derived, and this case requires our action in that behalf.

The main witness introduced by the defendant to disprove fraud, has shown himself to be corrupt and unworthy of belief. His testimony taken at different times, is contradictory and inconsistent with that of other witnesses of known good character. The deplorable fact that two verdicts have been rendered in conformity with it, increases the enormity of the offence, but cannot legalize it.

It is nothing to me that the jury may have thought differently of this witness. In passing upon testimony of any kind, I claim the right of private judgment. I will not receive as true, on the faith of others, evidence which I firmly believe to be false.

I admit that I do not know what influence it had upon the jury, nor that the verdict would not have been the same without it; but it is sufficient for the position I take, that it was heard in the trial of the cause, and that it soils now the records of the court.

We have heretofore met all such exhibitions of depravity, in a manner that makes it the interest of parties litigant to avoid having recourse to them. I consider the decree about to be rendered as an unfortunate deviation from that salutary and fruit-bearing course.

I am of opinion that the judgment ought to be reversed, and the case remanded for further proceedings.

KING, J. After a careful consideration of the evidence in this cause, I have been unable to convince myself that it supports the verdict of the jury. The difficulties of the case grow out of questions of fact, depending on the weight of testimony and credibility of witnesses. In such cases great respect is due to

the verdicts of juries. Their decisions, however, on matters of fact as well as of law, have been expressly subjected to revision; and, in the exercise of that jurisdiction imposed on this court, cases most occasionally present themselves in which the mind refuses its assent to the conclusions at which juries may have arrived.

In such cases, there can be no hesitatation between duty and the deference due to the findings of juries.

The facts and reasons which repel the conclusion that the plaintiffs assented to the sale, or were aware that they were becoming purchasers, have been so fully stated in the opinion read by the judge *(Rost)* with whom I concur, that it is unnecessary again to repeat them.

I think that the judgment of the inferior court ought to be reversed, and the cause remanded for further proceedings.

SLIDELL, J. This case has already been before the Supreme Court, and was remanded for a new trial. The report is in 3d Robinson, page 345; the pleadings are there stated.

The act of sale was manifestly not an authentic act, and this the counsel of *Furst* concedes. Can it avail as an act under private signature?

This act was not signed by the plaintiffs; not knowing how to write, they affixed their marks. It is said that a sale of immovables cannot be thus made; that the Code recognizes the substitution of a mark for a signature only in acts passed before a notary and two witnesses; that an act not notarial requires the signature of the party. Upon the general question, I express no opinion. But in this case the parties, under oath, in their petition for an injunction of the judicial sale, and in which also they pray that this act of sale and mortgage may be rescinded and cancelled as null and void, have acknowledged that they did affix their marks to this act, and to the notes held by *Furst.* The will of a party is manifested by affixing a mark, as well as by signing his name. The argument upon the impolicy of binding the rights of the ignorant, upon proof by witnesses, that the ignorant party affixed his mark, fails in a case where the party himself solemnly, in a judicial proceeding, acknowledges the mark. A mark wants the individualizing characteristics of a signature, and perjury has a wider and safer scope in the one case than in the other; but there can be no vestige of doubt of the genuineness of the mark, when the party himself judicially and under oath acknowledges it.

This brings us then to the true enquiry in this cause. Has the fraud alleged by the plaintiffs been committed? The allegation in their petition is, "that the act of mortgage, and the notes or note on which said order of seizure and sale has been granted, are absolutely null and void, and cannot be legally enforced against your petitioners or their said property, but the same ought to be rescinded, cancelled and annulled, because the mortgage and notes have been obtained from your petitioners by the fraud, artifice and deception of *Favre Hazeur*, a free man of color, acting as agent, and at the instance, of said *Furst.*" Again, going into more minute detail, they say: "The said acts and notes are void, because your petitioners were led into error by said *Hazeur* as to the nature of the said contract, the said *Favre Hazeur* acting as agent of said *Furst*, and, by and with his knowledge and consent, as your petitioners are informed and verily believe, persuaded your petitioners that said *Furst*, or some one else, was buying their said tract of land at the price of $60,000, or at a very large price, and that said act of mortgage was their act of sale of their said tract, and not as it

really is, an act of purchase and mortgage on their part. Your petitioners are **BEAULIEU** ignorant and unfortunate persons, not knowing how to read or write; said acts **v.** and said notes were never read nor explained to them, nor understood by them; **FURST.** they were constantly told by said *Hazeur*, agent of said *Furst*, that they were selling, at an immense price, their said tract of land, and that they must sign said act and said notes, to complete their sale, and realize an enormous fortune, all of which they believed."

So in their first petition they say "they did affix their marks to said papers, through error." &c.

The question then is, not whether the plaintiffs executed this act and these notes, but whether the fraud alleged has been practised, whereby they, believing themselves sellers, are in reality purchasers and mortgagors?

The duty of the court, in this case, is not free from difficulty. If I had not before me the verdicts of two juries, by which twenty four citizens have, under oath, unanimously declared that this alleged fraud has not been committed, I might, perhaps, have yielded to the views of two of my brethren, for whose opinions I entertain a very great respect, and have consented to the remanding of this cause for a new trial. But great consideration is due to those verdicts. This cause, as stated by the Chief Justice, turns mainly on questions of fact; and it has been the settled jurisprudence of the Supreme Court of this State, since its earliest existence, not to disturb the verdict of a jury in cases of fraud, unless manifestly erroneous.

Here are two verdicts in favor of *Furst*. The previous verdict was disturbed by our predecessors upon a purely technical ground, to wit, that the plaintiffs in injunction had the right of opening and closing the cause before the jury, and that the district judge had deprived them of that right. Both these verdicts were, on motions for new trials, approved by the district judge. To the opinion of the district judge, twice expressed, is added the opinion of the Chief Justice.

It is said, by two of my brethren, that the plaintiffs have not had a trial before their peers, and that it is the duty of the court to shield them from the prejudices of caste. We must take the law of jury trial as we find it. If this cause be sent back, it will be tried again by a jury of white men; and if the argument be a sound one, a new reversal should follow for the same reason. If it can be said that, under our social organization and the provisions of our laws, the trial by jury between the white and colored man is unequal, and the latter must seek protection from the judiciary, it must be remembered, in this case, that the inequality is of the plaintiffs' own seeking, and that the protection was not originally invoked. The prayer for a jury came from themselves; the jury was the tribunal of their own choice.

I must also observe that, in cases involving such questions of fact as are presented in this cause, there is much to sustain the rule of our jurisprudence, which I have already referred to as consecrated by a long series of decisions.

While judges, from the nature of their vocation, are isolated from the everyday walks of life, jurymen, on the contrary, are constantly moving in them. Dealing with the world, and not with books, they are better qualified to appreciate the motives, characters and conduct of their fellow citizens, and have a more practical conception of the bearing of facts. Moreover, jurymen confront the witnesses, and have a better opportunity of estimating their intelligence, their fairness, and the general weight of their evidence. The tone,

BEAULIEU
*v*
FURST.

manners and appearance of a witness, his candour, or his reserve, his prompt-
ness or his hesitancy, his calmness or his excitement, these, and other circum-
stances, are matters that, from their nature, are not susceptible of being in-
scribed upon the record. It comes before us a cold and inanimate transcript of
the mere words that were uttered, and these often inaccurately or ambigu-
ously preserved.

I would not voluntarily abandon our power to reverse the verdict of a jury
on a question of fraud; but I hold such a verdict to be entitled to great defer-
ence, and not be set aside except for manifest error.*

Such considerations, accompanied by a careful examination of the testimony
adduced in this protracted litigation, have induced me, so far as my opinion is
concerned, to leave the judgment of the court below undisturbed. It is proper,
however, that in doing so, I should briefly refer to some of the prominent facts,
which, coupled with the verdicts of the two juries, have led my mind to this
conclusion.

*Furst* himself stands before us unsullied by fraud. I do not understand the
plaintiffs' counsel as imputing it to him. The plaintiffs, by full interrogatories,
have appealed to his conscience. He unequivocally denies the charge of fraud,
and declares that *Hazeur*, by whom they allege that they were deceived, was
not his agent, but their own; that if any fraud has been practised, it was not
by himself, nor by his sanction. I find nothing in the testimony of the other
witnesses to impeach the good faith of *Furst*, or contradict his answers under
oath.

To *Hazeur* also the plaintiffs propounded interrogatories. In his answers
under oath he denies the fraud imputed to him, declares that he acted for the
plaintiffs, that he endorsed the notes at their request, that they must have
known that they were buying *Furst's* property, since they visited the ground
before the completion of the sale, and conversed with him about the sale; that
he also believes that they were aware of their mortgaging their property to
*Furst,* that he never attempted to impose upon them, but was their friend, and
endeavored to obtain the property for them at as low a price as he could.

It is evident, from other testimony, that *Hazeur* was the confidential adviser
and intimate friend of the plaintiffs. He was their agent for the sale of their
lands, as is shown by a written instrument executed by them. He is their en-
dorser on their notes.

*Furst* did not bargain for a price, exorbitant at the time. The price, thirteen
thousand four hundred dollars, on a credit, was a fair price at the then rates.
We find that, in June, 1839, after the effects of the great monetary crisis had
matured, it was estimated by judicial appraisers at a cash value of ten thousand
dollars. The improvements put upon the property by *Furst's* vendor, and which
were quite new when *Furst* bought, having been built in 1835, cost six thou-
sanddollars. This sale was made in the month of April, 1837. In March, 1837,
*Furst* offered the property at auction, at a limit of fifteen thousand dollars; he
obtained, but rejected, a bid of thirteen thousand and some hundred dollars, on
terms of credit not materially more favorable to purchasers than in the sale to
plaintiffs.

---

* These remarks, with regard to juries, will not be considered as made generally. There
are many classes of cases which seem to me very unsuitable for the consideration of juries,
and in which their intervention is rather an impediment, than an aid, to the administration
of justice. Note by SLIDELL, J.

At this offering, at public auction, some of the plaintiffs attended to bid upon it. The veracity of the witness who asserts this is questioned, but it derives strong confirmation from the testimony of *Manuel Fleitas*, a witness whose veracity was neither impeached at the trial, nor questioned in the argument. The witness makes the following statement: "He sold the property to *Furst*. He saw *Bernard*, one of the plaintiffs, and one of the women now in court, and probably another woman, on the property visiting it. They went through the house. Witness was yet living in the house when they came there. They told witness they heard the property was for sale, and asked if there was any objection to their visiting it. Witness took them all over the house, and they examined it with care, and seemed to be well pleased. They also went out in the yard, and afterwards came back through the house. This was sometime between the last of January and the last of April. From all that witness saw of them, he did not see that they were so very ignorant; they seemed to be persons intelligent for their walk of life." That the premises were visited by some of the plaintiffs, is also shown by other testimony.

The marks of these purchasers were affixed to the acts and notes, in the presence of two witnesses. Both declared that the plaintiffs understood what they were doing. The veracity of one of these witnesses I did not understand as being impeached; but it was said he was inexperienced. He was a clerk in the notary's office, and was about twenty years of age.

The plaintiffs have executed other acts, both of sale and of mortgage, and have executed other notes.

The answers of some of them, when the notes were notarially presented to them at maturity for payment, negatived the idea that they were ignorant of the execution of the notes.

Several witnesses say the plaintiffs were very ignorant, and that one of them had arrived at an extreme old age. Were she the only purchaser, I might hesitate to affirm the judgment. But the others possessed their faculties, and are stated by some of the witnesses to be shrewd and cautious, and as intelligent as persons usually are in their walk of life Some of them were present in court and were seen by the jurymen. The question is, were they so ignorant as to believe they were selling, when in reality they were buying. The burden is clearly on them. By their own admission, they acknowledge they were making a contract of some kind. The power of attorney to *Hazeur*, executed in February, 1837, was offered by plaintiffs to corroborate their alleged error. This power authorized him to sell their land for forty thousand dollars; twenty thousand dollars cash, and twenty thousand dollars in notes at one and two years, bearing mortgage. If they thought that what they signed was the contemplated sale, how was it that this large cash sum was not told down to them, and that instead of receiving notes, they gave them. Such a degree of ignorance is conceivable; but what the plaintiffs ask us to believe passes the boundaries of the probable, and verges upon the incredible. Such, at least, was the unanimous opinion of twenty-four jurymen, and of the judge of the District Court, before whom this case was tried six times.

I cannot, however, close this examination of the facts of the case, without joining my colleagues in the deserved rebuke of the conduct of the notary, who, under his hand and seal of office, has declared that these persons appeared personally before him at his bureau in New Orleans, in the presence of the subscri-

BEAULIEU
v.
FURST.

ing witnesses, when in reality the act was executed in the parish of Jefferson, out of his presence, and in presence of only one of the subscribing witnesses. The office of notary is one of great trust and high responsibility. . In the discharge of his official duties he should consider himself the especial guardian of the illiterate and humble, to read and explain to them the effects of what they sign, and to protect them against the superior intelligence of the educated, and the artifices of the designing. His official duty was grossly neglected in the present case.

It remains to notice briefly some points of law presented by the plaintiffs.

It is said there was no delivery of possession; but the act acknowledges possession, and, as between the parties, such acknowledgment is binding. Civil Code, arts. 2417, 2239.

It is said that the verdict rendered in favor of *Furst* was irregular, because there was no claim in reconvention upon which to found it. This cause was tried, and a judgment rendered previously. It was evidently considered, at the former hearing before the Supreme Court, that *Furst's* reconventional demand was still pending. See 3 Robinson, 347. The multifarious pleadings with which the record is crowded have been treated by the parties as consolidated, and were properly so considered by the court below.

The objection of a want of parties by reason of the death of *M. J. Beaulieu*, does not appear to me tenable. There was no action to make new parties by the plaintiffs, themselves the forced heirs of their mother, and she an usufructuary under the father's will. So far as *Furst's* claim was concerned, he surviving parties were bound to him *in solido* upon the notes, and against those who were in court, a verdict was properly rendered for the amount of their indebtedness.

The certificate of the parish judge of Jefferson, accompanying a copy of the will of *Joseph Beaulieu*, does not set forth the probate proceedings; but the defect is supplied by a recitation in the act of sale, in which the will is announced as the the title of plaintiffs, and is declared to have been duly probated in the Probate Court of that parish.

In conclusion, I must remark, that in this case, the plaintiffs have had the benefit of six trials, and of the services of counsel of great eminence. While no jury has ever found for them, two have found against them. The costs and other expenses of this litigation must have been enormous, and it has occupied over and over again the time of jurymen and judges, during a harassing litigation of more than eight years. It is time this contest should close. *Interest reipublicæ ut sit finis litium.*

In my opinion, the judgment of the court below should be affirmed with costs.

Forasmuch as, upon the question of the affirmance or reversal of the judgment upon which the appeal in this cause is taken, the judges of this court are equally divided in opinion, in obedience to the 68th article of the constitution the said judgment stands affimed, the appellants paying the costs of this appeal.